**Bevan v. The Reading Company**

*John M. Wajert,* for plaintiffs.

*Thomas A. Riley, Jr.,* for defendants.

KURTZ, J., July 3, 1969.—This is an action to quiet title. Although we are of the opinion that ejectment would have been the appropriate form in which to bring the action, since it would appear that at least one of the defendants is in possession of the land involved, cf. Pennsylvania Rule of Civil Procedure 1061(b)(2), that objection has not been raised upon

this record from which we conclude that it has been waived. See Pa. R. C. P. 1032.

Plaintiffs are the successors in title to Jonathan Major and David Wells who executed releases in favor of the Pickering Valley Railway Company in August and September of 1870. Defendant, The Reading Company, merged with Pickering in 1945, as a result of which it succeeded to Pickering's rights in the land in question. Reading has now undertaken to sell those rights to the other defendant, Valley Forge Scenic Railroad Company, Inc. This latter defendant came upon the record after the suit had been started when it was stipulated that it would be permitted to intervene as a party defendant. That intervention was ordered by the court. By the same stipulation it was agreed that transactions occurring after the institution of suit could be considered along with those which occurred prior thereto in our disposition of the matter.

The case is before us on plaintiffs' motion for summary judgment under the provisions of Pa. R. C. P. 1035(b). Such judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The pleadings consist of an amended complaint, an answer thereto with new matter and a reply to the new matter. In addition, requests for admissions have been made of record to which answers have been given, and a copy of a written agreement of sale entered into by Reading and Valley Forge has been made a part of the record by stipulation.

There are two principal questions presented. The answer to the first requires a construction of the releases mentioned above so as to determine what inter-

ests, if any, Pickering acquired by reason of their provisions. The second requires a determination as to whether Reading has abandoned the rights it acquired through its merger with Pickering.

Plaintiffs contend that all Pickering acquired under the releases was a "right-of-way for railroad purposes," see Brookbank v. Benedum-Trees Oil Company, 389 Pa. 151 (1957), while defendants assert that it acquired a fee simple title to the land. There is no evidence in addition to the releases themselves as to the circumstances surrounding their executions. Reference to the photocopies thereof attached to the pleadings discloses that they were written entirely in longhand. However, there is no indication as to the identity of their scrivener, neither have we been informed as to the interest which he represented.

The rules by which these instruments must be construed have been set forth in a footnote to Brookbank, supra, appearing at page 157 of the court's opinion. They are as follows: "(1) [T]he nature of and quantity of the interest conveyed must be ascertained from the instrument itself and cannot be orally shown in the absence of fraud, accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words . . .; (2) effect must be given to all the language of the instrument and no part shall be rejected if it can be given a meaning . . . ; (3) if a doubt arises concerning the interpretation of the instrument, it will be resolved against the party who prepared it . . . ; (4) unless contrary to the plain meaning of the instrument, an interpretation given it by the parties themselves will be favored . . . ; (5) 'To ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed' . . ."

Each of the instruments in question was designated a "release." The preamble in each recited that Pickering "have ascertained fixed marked and determined the route for their Railroad . . . and have occupied or intend to occupy *for the purposes of said Railroad* a strip or piece of land bounded and described as follows to wit . . . ." (Italics supplied.) The tract described in the Major writing contained 2.304 acres which bordered 715 feet on French Creek, was 115 feet wide at one end and 200 feet wide at the other. The description of the Wells tract indicates a frontage of 630 feet along the creek with a width at one end of 200 feet and 120 feet at the other. It contained 1.888 acres.

Neither document contained any words of grant. On the contrary, each provided that the one who executed it "have remised released[1] quitclaimed and forever discharged and by these presents do remise release quitclaim and forever discharge the said [Pickering] their successors and assigns *of and from all suits claims demands and damages whatever for upon or by reason of their entry upon and taking and occupying the above-described piece or strip of land and the location and construction thereon of the said Railroad and works connected therewith . . ."* (Italics supplied.) Each document contained a covenant to the effect that Pickering should not be required to erect or maintain fences along the boundary lines of each tract and it was further provided in each that "no nonuser of the above-described piece or strip of land or any part or portion thereof by the said [Pickering] their successors or assigns or no user occupation or possession thereof or of any part thereof by me my heirs executors administrators or assigns whether by residence cultivation or enclosure or otherwise for any period of time whatever whether

---

[1] "Released" was not included in the Major instrument.

for twenty-one years or longer shall in any manner affect the right or title of the said [Pickering] their successors and assigns to the entire and exclusive possession of the same".

The Wells instrument contained the additional provision that "it is understood that the foregoing consideration includes all and every claim for damage which the said Wells has sustained or may hereafter sustain by reason of being deprived of access to French Creek." The consideration recited in the Major document was "the advantages to be derived by me by reason of the location and construction of the said Railroad [and] the sum of Three hundred dollars cash and fifty dollars in stock of said Railroad Company." The consideration recited in Wells was "the advantages to be derived by me by reason of the location and construction of said Railroad [and] the sum of Two hundred and fifty dollars in the stock of the said Rail Road Company."

In Brookbank, supra, the Supreme Court construed a document which purported to convey a strip of land 66 feet wide to a railroad company as a release for damages accruing to the owners of that strip when the railroad company acquired a right of way for railroad purposes over it through the exercise of its power of eminent domain. In that case, as in this one, the company involved acquired that power under the provisions of the Act of February 19, 1849, P. L. 79, sec. 10, 15 PS §4061. (Pickering was incorporated June 4, 1869, by a special act of the General Assembly, the Act of April 3, 1869, P. L. 686, which specifically conferred the powers and privileges enumerated in the Act of 1849, supra, upon it).

In Brookbank the court pointed out that notwithstanding the words of grant contained in that instrument, the railroad company had completed two of the steps necessary to the condemnation process by caus-

ing a survey of the strip of land in question to be made and by the adoption by its board of directors of a resolution of condemnation. The court construed the instrument to be the written evidence of the third and final step in condemnation, i.e., the payment of the damages which flowed from the acquisition of the strip condemned.

In the instant case the company has accomplished the first step in condemnation by causing surveys to be made. Those surveys are incorporated in the documents now being construed. There is no evidence that a resolution of condemnation was ever adopted by Pickering's board of directors. In both Brookbank and the case at bar the widths of the strips involved exceeded 60 feet. That fact has significance because the Act of February 19, 1849, supra, limits such acquisitions to that width except in locations where a wider strip is necessary. Nevertheless, we are constrained to hold that the acquisitions here in question amounted to no more than rights of way for railroad purposes and in reaching this conclusion we lay particular stress upon the language employed in those writings. There must have been a resolution of condemnation and there must have been circumstances which justified a taking in excess of 60 feet; otherwise, no damages would have accrued for which releases would have been necessary when payment was made.

We are not unmindful of the provision of the Wells instrument which refers to a loss of access to French Creek; neither have we ignored those portions of both writings which refer to Pickering's "entire and exclusive possession" of the tracts involved. A right of way for railroad purposes includes many more attributes than does an ordinary easement of passage or right of way for purposes of ingress or egress. Such a right was described by the Supreme Court in the

case of Gillespie v. Buffalo, Rochester & Pittsburgh Railway Company, 226 Pa. 31, 32, 33 (1909) as follows: "In the latter case (Penna. Schuylkill Valley R. R. Co. v. Paper Mills, 149 Pa. 18) Mr. Justice Mitchell delivering the opinion of the court says: 'Such title is sometimes called an easement, but it is a right to exclusive possession, to fence in, to build over the whole surface, to raise and maintain any appropriate superstructure, including necessary foundations and to deal with it within the limits of railroad uses as absolutely and as uncontrolled as an owner in fee.' In the case of Pitts., Fort Wayne & Chicago Ry. Co. v. Peet, 152 Pa. 488, the court by Mr. Chief Justice Paxson said: 'The vice of this argument consists in treating the plaintiff's right as a mere easement or right of way. It is a great deal more than a right of way. It has the actual possession of the property, and that possession is exclusive, at all times and for all purposes, except where a way crosses it: . . . The estate acquired by a railroad company by a condemnation of land is often spoken of as an easement, but the term is used in a loose way for the purpose of distinguishing it from a fee.' " Thus it is obvious that the right to exclusive possession is only one of the attributes of that type of interest which Pickering acquired. Such an interest includes many more privileges than does the usual easement but it is an easement nonetheless; it is something less than a complete fee. For that reason the references contained in the instruments before us were not inconsistent with the acquisition of an interest less than a fee simple title. Indeed, that language is entirely consistent with the position for which plaintiffs here contend.

This position is strengthened by the fact that the documents in question contain no habendum, tenendum or warranty clause. Addressing itself to that phase of the case in Brookbank the opinion of the Su-

preme Court states at pages 162 and 163: "Bearing on the character of this instrument is the omission of habendum, tenendum and warranty clauses. If the railroad intended to receive a fee, is it likely that it would not have required of Ingrahams a warranty of their title? If the railroad intended to receive a fee, is it likely that a habendum clause—descriptive of the extent of the estate conveyed—would have been omitted? It seems inconceivable that the railroad would have omitted these clauses from an instrument of conveyance under whose terms they intend to receive a fee simple estate."

But even if formal condemnation under the Act of 1849 had not been instituted by Pickering at the time these releases were executed and Pickering accepted the releases only as the instruments of conveyance by which it acquired its rights, the result would be the same. A comparison of the language of the releases with the language of the Act of 1849 makes it clear that the results contemplated by the one are the same as those envisaged by the other. The verbiage of the instruments themselves makes it clear that Pickering's effort was directed to the acquisition of rights of the same nature and quality as those which it would have acquired had it exercised its statutory power. Such an estate is called a right of way for railroad purposes, the attributes of which have already been discussed.

No more need be said in justification of our conclusion as to the nature of Pickering's interest in the land here involved. If further authority is required in that regard, we would point to Hoffeditz v. South. Penn. R. & M. Co., 129 Pa. 264 (1889), where language identical with that contained in the instruments now at bar was construed to be a release of damages, and Kemp v. Pennsylvania R. R., 156 Pa. 430, 441, 442 (1893), in which the holding of the

Hoffeditz case was reaffirmed. We now turn to the second question presented by this case as we have set it forth above.

In our consideration of that question it is appropriate for us to note that Pickering and later Reading operated trains over the tracks installed upon the land until sometime prior to November 29, 1965. In April of 1964, Reading made an application to the Interstate Commerce Commission for a certificate of public convenience authorizing the "abandonment of the line itself." By certificate and order dated July 22, 1964, that commission, noting that the abandonment of the line as proposed by Reading would not unduly deprive the public service, that there was no foreseeable future use of the line, and that its continued operation and maintenance would impose an undue and unnecessary burden on Reading, permitted the abandonment of the line and directed that Reading submit the date of actual abandonment to the commission in writing. By letter dated February 16, 1967, Reading indicated to the commission that abandonment had occurred on July 30, 1964.

By various orders dated March 21, 1966, the Public Utility Commission of Pennsylvania permitted Reading to abandon certain grade crossings on the line, noting in those orders that Reading proposed to sell its facilities upon this portion of its line to Valley Forge, who intended "to operate over it as a scenic railroad for the amusement of its patrons and not as a public utility." Thereafter, on December 9, 1967, Bevan, one of the plaintiffs to this action, filed a complaint with that commission alleging that Reading had failed to file an application for a certificate permitting the abandonment of service, that service upon the line had ceased and that service had been refused to him. This complaint was dismissed on Reading's mo-

tion by order of the commission entered June 10, 1968. In that order the prior action of the Interstate Commerce Commission concerning the line was noted and it was pointed out that the Interstate Commerce Commission had jurisdiction to grant the authority to discontinue service and operation as it did. Concerning its prior orders permitting the abandonment of grade crossings the commission said: "Within our order, this Commission acknowledged and approved the order of the Interstate Commerce Commission authorizing abandonment of the line."

On April 22, 1966, Reading and Valley Forge entered into a written agreement under the terms of which the latter agreed to purchase from the former "all its right title and interest of, in and to ALL THAT CERTAIN strip of land comprising the right of way of portion of the Pickering Valley branch of the railroad of Reading Company. . . ." That agreement further provided that a quitclaim deed should be executed and delivered by Reading in consummation of the sale of the real estate and that a bill of sale be given for all the track, bridges, culverts, etc. Settlement pursuant to that agreement was held on or about December 21, 1967.

In Lacy v. East Broad Top Railroad and Coal Co., 168 Pa. Superior Ct. 351 (1951), the Superior Court considered the question of a railroad's abandonment of its right of way acquired through the exercise of its power of eminent domain. The court said at pages 354 and 355 of its opinion: "By condemnation proceedings a railroad acquires a 'base or conditional fee, terminable on the cesser of the use for railroad purposes': . . . . The land thus acquired by the railroad is held by it as a public trust, which it may abandon only with the consent of the Commonwealth. . . . The consent of the Commonwealth may be evidenced by an Act of the General Assembly, . . . ,

or by an official authorized by it to act on its and the State's behalf. The legislature's supervisory power in respect of railroads has been committed and delegated to the Public Utility Commission which is 'an administrative arm of the legislature,' whose members are 'deputies of the general assembly to perform legislative work.' . . . . It is the representative of the legislature to the extent of its statutory powers. . . . . The Public Utility law . . . , authorizes it to grant a certificate of public convenience: 'For any public utility to dissolve, or to *abandon* or surrender, in whole or in part, any service, right, power, franchise, or privilege.' (Italics supplied.) The Commission is thereby abundantly empowered, on behalf of the Commonwealth, to consent to an abandonment, whether of service or of essential rights and privileges, and except for the legislature itself, is the only organ of government which may grant the Commonwealth's consent. The Commission's certificate of public convenience is the authoritative token of the formal consent of the Commonwealth to an abandonment or surrender."[2]

Again, at pages 357 and 358 of that opinion, it was said: "However, we do not rule, . . . , that the Commission's certificate in itself, without more, constitutes an abandonment. The Commission did not attempt to, and manifestly could not, determine or adjudicate the property or contractual rights of the parties to this litigation. . . . . At most, the proceedings before the Commission constitute only the expression of the railroad's intention to abandon its right-of-way, the Commission's conditional approval

---

[2] Although the provisions of the Public Utility Code quoted above have been amended by the Act of August 24, 1963, P. L. 1225, section 2, 66 PS §1122, the jurisdiction of the Public Utility Commission has been left unchanged, see Zeiter, "An Invitation to Public Utilities — The Amended Pennsylvania Business Corporation and Public Utility Laws," 113 U. Pa. L. Rev. 187, 208 (1964).

of the plan of abandonment, and the consent of the Commonwealth thereto. To constitute an abandonment, there must be an intention to abandon, together with 'external acts' by which the intention is carried into effect. . . . . The estate of a railroad does not terminate until there has been an actual abandonment. . . . . Mere nonuser of a right of way does not constitute an abandonment. . . . . Whether the railroad has actually abandoned the right of way, whether it has acted upon and effected its expressed intention to abandon, so that plaintiff's reversionary rights became operative, is a question of fact to be determined at the trial. 'The question of abandonment is one of fact for the determination of the jury, depending upon all the facts and circumstances disclosed by the evidence of each particular case': . . . ."

In this case Reading's intention to abandon its line may be found in its applications to the two regulatory commissions mentioned above, from its letter to the Interstate Commerce Commission dated February 16, 1967, in which it indicated that abandonment had occurred on July 30, 1964, and from its participation in the application which Bevan made to the Pennsylvania Public Utility Commission in 1967. The Commonwealth's consent to the abandonment may be found in the various orders which the Public Utility Commission entered upon those applications made to it. Has Reading performed or accomplished the third step necessary to complete abandonment, i.e., have the necessary "external acts" been performed by it so as to produce that result?

In Lance's Appeal, 55 Pa. 16, 25 (1867), the Supreme Court held that the power of eminent domain can never be exercised except for a public purpose supposed and intended to benefit the public, and that "*after the right has been exercised the use of the*

*property must be held in accordance with and for the purposes which justified its taking. Otherwise, it would be a fraud on the owner, and an abuse of power."* (Italics supplied.) In Bennett v. Pennsylvania Electric Company, 24 D. & C. 2d 59 (1960), this principle was applied so as to prevent defendant electric company from leasing its poles located on a right of way acquired through condemnation to a private company for private use. In Pittock v. Central District & Printing Telegraph Company, 31 Pa. Superior Ct. 589 (1906), a railroad company which had acquired a right of way over plaintiff's land through condemnation under the power conferred by the Act of 1849, supra, granted a telegraph company the right to erect poles on that right of way for the private use of that company. In treating the telegraph company as a trespasser, the Superior Court said at page 596 of its opinion: "The defendant could not have secured a right of way from the plaintiff adversely and we think this cannot be done indirectly by acquiring from the railroad company a right which it had no authority to grant."

Here Valley Forge is in the same position as were the electric company and the telegraph company in the two cases last cited. Valley Forge could not have acquired the rights of Reading of its own initiative since it did not purport to serve a public purpose; neither does it do so in fact. Therefore, when Reading attempted to convey its rights to a purchaser who had no power to operate them, it is clear that it committed the act of abandonment from which a reversion of its rights to plaintiffs properly followed. At that moment Reading effectively stopped serving a public purpose. This was more than a mere nonuser; this was an act which might accurately be compared to the drilling of the gas wells in Brookbank. By this act Reading stopped using the land for the purposes

for which its rights therein were acquired. The fact that Valley Forge also operates trains across the land can make no difference. Reading's interests were acquired for a public purpose. When it abandoned that purpose, it abandoned all rights necessary to the pursuit of it.

Accordingly, being satisfied as we are that there is no genuine issue of fact on this record and that plaintiffs are entitled to judgment as a matter of law, we must decree that they are the owners of the tracts here in question, and that their titles therein are unencumbered by the releases of Major and Wells executed in August and September of 1870. We must also decree that defendant, The Reading Company, has abandoned any rights it acquired in the land as the assignee of Pickering Valley Railway Company, and that its attempt to convey such rights to the defendant, Valley Forge Scenic Railroad Company, Inc., was a nullity.

Judgment in accordance with the foregoing is entered in favor of plaintiffs and against defendants.